G. E. Tucker and G. Waller *v.* Estate of T. Metcalf, deceased.

$1,500, assumed to be the entire percentage named in the codicil, be allowed.

The entire percentage can not be allowed, and the said sum of $1,500 is to be refunded to the King estate.

Let judgment be entered up accordingly.

Honolulu, November 17th, 1869.

## SUPREME COURT—IN BANCO.

*Allen, Ch. J., Hartwell, J.*

GEORGE E. TUCKER AND GILBERT WALLER, *vs.* GERRITT P. JUDD, EXECUTOR, AND J. W. AUSTIN, ADMINISTRATOR, WITH THE WILL ANNEXED, OF THEOPHILUS METCALF, DECEASED.

A PARTNERSHIP is made only by actual agreement, and not by operation of law, when parties agree to act together as principals, and is dissolved on the death of any partner.

A partner cannot charge for PERSONAL SERVICES unless by agreement.

Partnership property must be devoted to debts and purposes of the partnership.

Under an agreement of co-partnership whereby all "IMPROVEMENTS" on a sugar plantation are at the expiration of the term of partnership to revert "to the plantation," firm money having also been devoted to improvement; HELD, that the RULE AS BETWEEN LANDLORD AND TENANT applies, and that the firm should take the crop standing at its dissolution, together with all stock, tools and engines removable without injury to the buildings and bought with firm money.

Bill in equity, with exhibit annexed, filed May 30th, 1868; process issued, returnable June 16th, before the Chancellor;

G. E. Tucker and G. Waller *v.* Estate of T. Metcalf, deceased.

answer filed September 19th; replication filed October 3. August 5, 1869, the respondents' counsel moved to dismiss, for want of prosecution. At the hearing of this motion, the complainants' counsel argued that there had been no delay on their part, but that one of the complainants had died, and the delay was caused partly by that event, and partly by their efforts to resist the discharge of one of the executors. The respondents' counsel agreeing thereto, and stipulating to take no advantage by reason of the non-appearance of any representative of Tucker, a hearing was assigned for August 5th, with the agreement that Hartwell, J., should sit with the Chancellor, and their decision be final.

The bill avers that, November 26, 1855, the complainants entered into the following agreement with the decedent: [Exhibit A.]

"That said Tucker & Waller take charge of the lumbering business belonging to the Kaupakuea Plantation, of Hilo, Island of Hawaii, for the term of two years; said Tucker & Waller to have sole charge of the sawmill, and all thereto belonging; they are to have the selection and control of as many bullock for working at the lumbering business as they may require, from the herd now on the plantation. They are also to have the use of the sawmill and all implements, such as yokes, chains, axes, &c., (an inventory of which will be hereunto appended,) now on the plantation, for their use, returning the same to said Metcalf at the expiration of the term above specified, in as good condition as when received by them. All oxen killed outright, or permanently injured, while in their service, shall be paid for at the rate of eight cents per pound when dressed, or at such reasonable price as may be agreed upon, at the time, between them and said Metcalf, or his agent. Said Tucker & Waller shall, however, have such beef as may be slaughtered at the plantation, for their own use, at the rate of four cents per pound at the shambles. Said Tucker & Waller are to furnish all

labor, provisions, in fact, everything that may hereafter be required for carrying on the lumber business as above intended, and to work faithfully and prudently at the same, during the term above specified. In consideration of the land, mill, oxen, implements, &c., &c., &c., supplied by said Metcalf, and the labor and material supplied by said Tucker & Waller, the proceeds shall be divided as follows : One half to said T. Metcalf, delivered by the other party at the place of sale, and the other half shall belong to said George E. Tucker and Gilbert Waller. The usual words, ' executors, administrators and assigns,' are understood to apply, always, to both parties to this agreement.

"In witness whereof," &c.

That the said agreement was superseded February 14th, 1856, by the following, viz. :   [Exhibit B].

*   *   "That said Tucker & Waller shall take charge of the plantation of Kaupakuea, in the district of Hilo, Island of Hawaii, for the term of *ten* years upon the following terms and conditions, viz. :-  Said Tucker & Waller shall furnish all labor and provisions for carrying on the plantation, and also all tools and implements that may be required during the term of this agreement. All necessary fence and buildings shall be made and credited at the expense of said Tucker & Waller,—said Metcalf agrees, however, to furnish any nails, butt-hinges, locks and fastenings that may be required for any substantial wooden buildings that said Tucker & Waller shall hereafter erect. The saw-mill now on the place shall be kept in and returned in good condition for sawing, also the wooden dwelling house (or an equally good one) now on the place shall be returned in good condition to live in. All other buildings for which T. Metcalf has furnished nails etc., in the construction shall revert at the expiration of this agreement in good condition. Said Tucker & Waller shall take good care of all bullock and horses or other cattle and their increase belonging to

said T. Metcalf and now on, or that he may hereafter put upon the place, castrating and branding all that require it, at least four times in each year, paying all trespass, also all losses and damages to cattle through their negligence.

"All cattle sold, or otherwise disposed of from the place, shall be delivered at the place of sale, if on the island of Hawaii, if elsewhere, then to the vessel at the place of delivering at the expense of said Tucker & Waller. They are also to keep a true book account of all transactions wherein said T. Metcalf is interested. They shall keep an exact account of all beef consumed by them upon the place, for which they shall credit said Metcalf at the rate of four cents per pound. All pork, fowl or other flesh than beef which they may require for food only and grown upon the place, they shall have free of charge. Said Tucker & Waller are to have as many and such bullock for work as they may select from the flock, being responsible for all losses and injury to said working bullock while in their service. They can also have the reasonable use of any horses belonging to said Metcalf that are now or may hereafter be upon the place, on the same conditions; said Metcalf does not however obligate himself to furnish horses for their use at any time. That in consideration of the labor, &c., furnished by said Tucker & Waller, they shall be entitled to one-half of the gross sales of all products of the plantation at the place of delivery, excepting the bullock and horse kind, upon all actual sales of bullock, they shall receive ten per cent., but upon the sales of the horse kind they shall receive nothing. Said Metcalf, however, is to control the sales of bullock and horses, he is also to have such bullock, for work and milk to take to the island of Oahu for his use there as he may require without deducting percentage. Said Tucker & Waller shall be permitted to have ten animals each for their own upon the land, at any and all times during the term of this agreement. They shall labor faithfully, diligently and economically, not only in

caring for the cattle on the place, but in all other branches of business where both parties are mutually interested. Said T. Metcalf agrees to bear one-half of the expense sustained by both parties in keeping an anchorage buoy in a condition to use in front of the plantation landing. It is agreed that in all places where the words 'executors, administrators and assigns,' are usually inserted in instruments shall be understood as implied in this agreement.

"I hereby agree that the words '*one-half* of the gross sales of all products of the plantation' shall and is hereby altered, so as to read '*two-thirds*, &c., &c., to said Tucker & Waller,' &c., also that instead of '*four cents* per pound' for beef, they (Tucker & Waller) shall pay me but *two cents* per pound."                                          T. METCALF.

Kaupakuea, March 2d, 1857.

That under the second agreement, the complainants took charge of the plantation, fenced and plowed a large portion of the land at their own expense, furnished labor and provisions for carrying on the plantation, and also tools and implements to the value of one thousand and eighty-nine dollars.

Exhibit C. is a schedule of the implements, with prices, footing up $1089, signed, "Received payment by note. T. Metcalf. Kaupakuea, Feb. 14th, 1856," and written across, "The articles herein above mentioned have this day been returned to the plantation. T. Metcalf. Kaupakuea, Dec. 14th, 1857."

That on December 14th, 1857, the second agreement was cancelled by the decedent with the complainants' consent, and the implements were turned over to the plantation, and the following third agreement was made : [Exhibit D.]

"* * That said Tucker & Waller are to take charge and carry on the sugar plantation, known as Kaupakuea, in the district of Hilo, owned by said T. Metcalf, for one-fifth of the profits each—said T. Metcalf furnishes the land with all its implements as it now stands, together with such bullocks and

horses as may be required for work, that are now on the plantation. The plantation being responsible for all injury to said bullocks and horses while in its service, also for the charge of keeping the same. Said Metcalf agrees to furnish all tools and implements now on the plantation free of charge, he also further agrees to furnish all other capital or means hereafter required for the sufficient conduct of the plantation, upon the condition of being allowed or credited the current rate of interest, for what means he may furnish personally, or the actual interest he is obliged to pay other parties for such accommodation, and said T. Metcalf is to receive three-fifths of the profits. This agreement shall continue for the term of ten years, at which time said plantation, with all improvements, shall revert to said T. Metcalf or his heirs.

"Said T. Metcalf has been persuaded against his better judgment, to agree to not charge interest on the capital furnished for the first twelve months from this date."

That the complainants, at the date of the third agreement, turned over to the plantation all the improvements they had made under the previous agreement, and received no remuneration therefor or for their labor performed under said agreement. That the complainants carried on the sugar plantation under the third agreement, gave all their care, labor and diligence on the same, made valuable improvements in fencing the land, erecting buildings, in the cultivation of the cane and manufacture of sugar, and doing all things by them agreed to be done.

That Metcalf performed his part of said agreement up to January 1st, 1862, and the plantation accounts were fairly kept and balanced up to that date, with the exception that Metcalf contrary to the terms and intent of the last agreement, charged the complainants for the cattle and horses he was bound by said agreement to furnish for plantation use.

That by the account current made and exhibited by the

complainants January 1st, 1862, and by Metcalf's letter of February 10th, 1862, [Exhibit E] the liability of the plantation was $21,624.23, of which sum $17,171 was then bearing interest, leaving the balance of $4,453.23, to bear interest from that date only.

That Aldrich, Walker & Co., were agents for the plantation from January 1st, 1862, to December 31st, 1865, and that in the plantation account stated January 1st, 1864, the plantation is wrongfully debited with $7,136.78, the private debts of Metcalf, which sum with interest to December 31st, 1867, amounts to $11,795 wrongfully taken from plantation profits.   That Walker, Allen & Co., were the successors of Aldrich, Walker & Co., as agents of the plantation, and acted in that capacity until Metcalf's death in San Francisco, August 6th, 1866, and thence acted as agents of the plantation for the executors of Metcalf's will until January 1st, 1867, when G. P. Judd became and has since remained the agent, having the plantation under his control and management.

That by Metcalf's will, duly admitted to probate, G. P. Judd was named as one of the executors, and accepted his trust as such executor, and the other persons named in the will as executors declining to accept the trust, the Court appointed J. W. Austin administrator with the will annexed, to act with Judd as executors, and that Judd and Austin qualified and acted, and still are acting under said appointment.

That the following clause is in Metcalf's will :   "And I do further charge and direct my daughter .Emma, that she do keep the plantation up to full working order, as far as in her lies, so that all my objects, hereinbefore expressed, may be fully accomplished, inasmuch as she is able."   [Exhibit F.]

That during the agency of Walker, Allen & Co., G. P. Judd, as said executor, gave Walker, Allen & Co., his seven promissory notes of $5,000 each, dated respectively on the 5th, 6th, 8th, 9th, 10th, 11th and 12th days of October, A. D. 1866, bearing interest at the rate of one per cent. per month,

and secured by mortgage on the plantation, said mortgage being also security for two of Metcalf's notes, amounting to $10,404.61, the mortgage itself setting forth that it was given in order that Walker, Allen & Co. might raise money. A copy of the mortgage is annexed to the bill.

That Walker, Allen & Co. subsequently obtained money from third parties, giving the said promissory notes as collateral ; that April 13th, 1867, certain of the notes were sold at public auction, and Judd and Austin, as said executors, bought Judd's note, as executor, for $5,000, and its accrued interest of $2,670, with proceeds of sugar sales, instead of using said proceeds to reduce the interest account and principal debt on the plantation.

That Judd, as plantation agent, charged the plantation $3,250 for the purchase of Metcalf's private note of $5,000 and interest, the note not being given on plantation account, and being then paid by proceeds of sugar.

That Judd, as said executor, charged the plantation $857.72 for shooks, which he in fact bought for about $162.50, and when asked for bill of sale, informed the complainants' counsel that after expending money upon them, he had sold them to the plantation at small profit.

That Judd credited sale of sugar to Walker, Allen & Co., April 17th, 1867, in the sum of $4,760.40, which was $34.51 less than the actual net of said sales ; that, January 4th, 1867, Judd debited the plantation $352.22, which was $100 more than should have been debited, besides the commissions charged.

That the accounts of the executors show nearly $63,000 as proceeds of the last incoming crop ; that Judd received 6,727 kegs of sugar, but his accounts, as shown to the complainants, account for only 6,625 kegs, or 102 kegs short.

That by the account current, since January 1, 1862, large and ruinous interest was paid, contrary to the agreement referred to in exhibit D., for money used on the plantation,

being over $5000 so paid, against the protest of the complainants.

That a note of $2000 and interest, amounting to $2,116.66, was paid July 29, 1869, from proceeds of the plantation, for which no credit was given to the plantation.

That Judd as agent credited the plantation $16 for four cords of wood sold to himself, which were in fact five cords, worth more than $16.

That in the year 1864 the complainants were greatly damaged by Metcalf's failure to furnish requisite machinery to dispose of a large and valuable crop of sugar, as he was bound to do by the terms of agreement D, until long after it should have been forthcoming, by which failure on his part two hundred and twenty-five tons of sugar, more or less, were lost to the plantation.

That the said executors of Metcalf's will failed to make an appraisement of his estate.

That about the expiration of their term of ten years under agreement D, the complainants demanded of the executors a full settlement of all matters relative to the plantation, but were requested to go on and all would be right, but not satisfied with so doing they again demanded a settlement, and were told by the executors to send their accounts to Honolulu and settle them, as there were no profits as would appear from the accounts rendered.

The bill avers that the complainants are entitled to two-fifths interest in all the improvements on the plantation, consisting of fences, tools, implements, horses, cattle, mules, carts, engines, and the necessary machinery to manufacture sugar placed there for that purpose, which have been paid for by their money and results of their labor, being the profits of the plantation.

Also, to two-fifths interest in a contract for fifty coolies, made July 29, 1865, for $8050.25, for eight years service on the plantation; and in a contract for twenty-five coolies, made

May 21, 1867, for five years service, and in the contracts of about one hundred native laborers on the plantation up to December 14, 1867, to whom advances were paid out of the profits of the sugar in which the complainants had a two-fifths interest.

Also, to two-fifths interest in all the sugar and product of the cane taken off the plantation since December 14, 1867, deducting cost of taking off the crop now coming in, the complainants' time and labor up to that date having been devoted to the cultivation of said cane and to the care of the plantation.   That the plantation accounts are unliquidated.

That Judd, since he has assumed charge as agent of the plantation, has charged a commission of five per cent. as such agent, and at the same time has received his commissions as said executor, and $300 for extra labor, one year; that while acting as such agent, he has paid over $13,000 of Metcalf's private debts from the proceeds of the plantation, or money borrowed by him to carry it on; that as such agent he has paid $1,844.69 to Metcalf's family, for their support and for other expenses, and July 31, 1867, transferred to the credit of the said executors, he being one, $2,821, both sums being paid from plantation proceeds, when the plantation was paying heavy interest, and when there were bills outstanding against the plantation to the amount of $2,622.54, and that G. P. Judd, in his double capacity as agent and executor, has mismanaged the plantation, and, together with J. W. Austin, executor, has failed and refused to make a just and equitable settlement of accounts with the complainants.

That Judd, as agent, charged the plantation $500 interest on J. H. Thompson's note for $5,000, which note said Thompson held only as collateral for a note of $3,000.

That upon a true and just settlement, a large balance would appear to be due the complainants.

That G. P. Judd ought to be compelled to discover the deficiency of the said 102 kegs of sugar, and the said Judd

and Austin, executors, to account for all the plantation proceeds under agreement D, and that a receiver ought to be appointed to take charge of the plantation, to appraise the value of the labor contracts and improvements, to dispose of the crop growing December 14th, 1867, to receive and collect all moneys due up to that date, and that the executors should, meanwhile, be restrained from all control over the plantation, and be ordered to pay to the complainants whatever may appear to be due them, upon appraisement of the improvements, crops and labor contracts, and final adjustment of accounts.

The bill prays for formal discovery of the charges concerning accounts, for the appointment of a receiver, and for an injunction against the executors.

The respondents' answer admits that agreements A, B, and D, were made ; that the tools described in schedule C, were furnished by the complainants, but avers that they were turned over to the plantation, as appears by exhibit C, and then became Metcalf's private property, and formed a part of what he agreed to furnish free of charge. The answer claims that agreement D operated as a final settlement, as well as cancellation and supersedure of all claims under agreements A and B, and denies that the complainants have any title or claim to the improvements made under agreement B, or that they received no remuneration for their labor and services under agreements A and B, or that they took charge and made valuable improvements under agreement D, averring that Metcalf had charge for two years from the date of the third agreement, and that his services therefor were worth $6,000, and that the complainants gave such care and services only, as any other two foreigners of ordinary intelligence and industry would be competent to perform, and which were worth only about $20 a month, with board and lodging, and that the improvements were made at the expense of the plantation, the complainants

merely contributing their services; avers that the plantation was at great expense for laborers and mechanics employed in erecting machinery and buildings, and making improvements.

Admits that the plantation accounts were fairly kept and balanced to January 1st, 1862, with certain exceptions, hereafter noted.

Denies that Metcalf charged for horses and cattle contrary to agreement D.

Admits the complainants' account of January 1st, 1862, showing the plantation liabilities to be $21,624.23, of which $17,171 were then bearing interest, leaving $4,453.23 bearing interest only from that date.

Admits that Aldrich, Walker & Co. were agents of the plantation from January 1st, 1862, to December 31st, 1865, and that the account current of January 1st, 1864, showed the plantation debited with $7,136.78 of Metcalf's private accounts, and that this sum with interest to December 31st, 1867, amounts to $11,795.

Admits that Walker, Allen & Co. were agents of the plantation, as charged; that Metcalf died August 6th, 1866, leaving his will, in which G. P. Judd is named as executor, and that Judd duly assumed the executorship of the will, and the others named in the will, declining the trust, J. W. Austin was appointed co-executor by the Court, and that Judd and Austin are still acting as such executors.

Admits that G. P. Judd became the plantation agent January 1st, 1867, and now has the same under his charge; and that Judd, as executor, gave the notes and mortgage as charged, averring that the said notes were given to liquidate a debt of $49,084, due Walker, Allen & Co. by the plantation, and thereby to save it from being sold on execution, at the suit of Walker, Allen & Co.

Admits that Walker, Allen & Co. subsequently raised money on said notes, as collaterals; that certain of the notes

were sold at public auction, and that Judd and Austin, as said executors, purchased Judd's note as executor, of $5,000, with accrued interest for $2,670, from proceeds of the sugar, and avers that this purchase saved about $2,630 to the plantation.

Denies that Judd paid large interest in order to make the purchase, instead of reducing the interest account from the proceeds of the plantation.

Avers, in regard to the allegation that Judd paid $500 interest on Thompson's note, held as collateral for a note of $3,000, that Metcalf, by his attorneys in fact, Walker, Allen & Co., executed said note of $5,000, July 17, 1866, indorsed by Walker, Allen & Co., payable in six months to their order, and held by Thompson as collateral, of Walker, Allen & Co.'s note to J. H. Thompson, for $3,000, and that Judd, as agent, June 15, 1867, paid $500 interest to Thompson on said note of $5,000, and August 30, 1867, charged the plantation $3,250 paid for the purchase of said note of $5,000 and interest, although the note was not on plantation account, but submits that the same was chargeable to the plantation in like manner with the sums paid for the support of the complainants and their families on the plantation.

Admits that said purchase was made from sugar proceeds and denies that the complainants were interested therein further than in the ultimate profits.

Avers that the shooks were charged by Judd as agent and not as executor, the shooks not being intended for use until the expiration of the ten years, agreed upon by agreement D., and that the same should have been charged against the crop of 1868.

Denies that the sale of sugar to Walker, Allen & Co., of April 17, 1867 of $4,760.40 netted $4,794.91, making a difference of $34.51.

Admits that Judd debited the plantation January 4th, 1867 with $352.22 making a difference of $100 besides commissions.

Denies that the complainants succeeded in procuring an examination of the plantation accounts only by great exertion and importunity and after needless delay on the part of G. P. Judd as agent of the plantation, and avers that when requested, he, with reasonable promptness, allowed them to examine the accounts, and that December 14, 1867, he furnished them a proximate statement of the condition of the plantation at that date, by which it appeared that the proceeds of the crop of 1867 were about $63,000.

Denies that G. P. Judd received 6,727 kegs of sugar and accounted for only 6,625 kegs, leaving a deficiency of 102 kegs, and avers that he accounted for 6,728 kegs.

Denies that large and ruinous rates of interest were paid for the money required to carry on the plantation, amounting in excess to $5,000 paid against the protest of the complainants.

Admits that a note of $2,000 amounting with interest to $2,116.66, due W. A. Aldrich was paid July, 29th, 1862 from the sugar proceeds, for which no credit was given the plantation.

Denies that Judd credited the plantation with 4 cords of wood sold to himself, but avers that he credited 4 piles of wood, and neither admits nor denies that the same was 5 cords or that it was worth more than $4 a cord, averring that the same was brought to Honolulu because owing to stress of weather it could not be landed at the plantation, and was credited at the same rate that the plantation was then paying for wood.

Denies that the complainants were damaged by Metcalf's failure to furnish machinery.

Admits that no appraisement was made by the executors.

Denies that about December 14, 1867, the complainants were requested by the respondents to go on at the plantation and all would be right, but admits that they were told to send their accounts to Honolulu and settle them, as there

were no profits, and the plantation was largely in debt as would appear from the accounts.

Denies that the complainants are entitled to two-fifths interest in all improvements on the plantation or in the several coolie or native labor contracts, or that the advances of the coolies or native laborers were paid for out of the profits of the plantation under agreement D; or that the complainants are entitled to two-fifths interest in the cane taken off subsequently to December 14th, 1867, after deducting cost of taking off the crop now coming in.

Admits that the complainants' time and labor to December 14, 1867, were expended in cultivating said cane and keeping the plantation in order, also, that the plantation accounts are still unliquidated.

Admits that Judd as agent has charged five per cent. commissions, and at the same time received his commissions as executor and $300.00 for extra services in one year, but avers that the same were allowed by Hon. Robert G. Davis, Associate Justice of Supreme Court, August 13, 1867; denies that since Judd has assumed charge of the plantation he has paid from its proceeds over $13,000 of Metcalf's private debts not chargeable to the plantation.

Admits that Judd paid $1,844.69 from plantation proceeds for the support of Metcalf's family and other expenses, and that July 31st, 1867, he transferred $2,821 from plantation proceeds to the credit of the executors, he then being one, but avers that the said sum of $1,844.69 is included in the said sum of $2,281, and denies knowledge of any outstanding bills then due against the plantation, but admits liabilities not then matured.

Denies that Judd in his double capacity as agent and executor has mismanaged the plantation either alone or with Austin, or failed to make a full, just and equitable settlement, or that a large balance due the complainants would appear upon a just settlement of accounts, but submits that

an account of several large sums of money and goods, wares, merchandise and live stock furnished by Metcalf and used by the complainants and their families, and by them sold and disposed of, with interest on such sums, would show that a large balance is due Metcalf's estate by the complainants.

Claims that the plantation account of January 1st, 1862, should be corrected by charging to the plantation the following items, viz: $6,000 due Metcalf for his services in managing the plantation for three years, $100 due Metcalf for the use of a certain land on the plantation, by him purchased April 2d, 1859, known as the "Hema" premises, and worth $200 to the plantation, $2,000, the amount of a note to R. C. Wylie, also large sums of money paid by Metcalf for insurance on the plantation buildings previous to and since January 1st, 1862, and $227.25 paid to A. B. Bates, as counsel fees.

The replication sets up no new matter.

HARTWELL, J.:  The papers present some complication, but there are few unsettled points of law involved in the case, which require the judgment of the Court. The first point is whether Tucker and Waller were Metcalf's partners, or his agents only, to be remunerated by shares in the profits. There has been a series of decisions in the English and United States courts, commencing with the leading case of Waugh *vs.* Carver, 2 H. Bl., 235, in 1789, to the effect that parties might become liable for each others' acts as partners, contrary to their own intention or expressed agreement. If A and B agreed that B carry on a work for A, for a share of profits, B was held liable for the debts contracted for that work, notwithstanding he may have expressly stipulated that he should not be liable as a partner, provided the creditor was not aware of such stipulations. Various reasons were given in support of this doctrine that a partnership could thus be created merely by operation of law. It was said that taking profits "as profits," and not as wages, indicated a

partnership between the parties as far as they were themselves concerned, as well of course as far as others were entitled to regard them. As the decrease of the partnership fund by liens for profits is the loss of private creditors, it was argued that any person having such a lien must be a partner. But this is assuming what should be proved, by a species of *petitio principii,* or "begging the question." If there is no partnership, creditors care nothing whether their debtor has paid his agent with money "as profits," or "as wages." If the debtor undertakes illegally to prefer claims, they may be contested, but it is hard to see why a prior agreement that the agent's claim shall be preferred, must of necessity create a partnership and impose a liability never intended. Courts often objected to this doctrine. Lord Eldon was reluctant to accept so "thin" a distinction as a conclusive test, Judge Story regretted while he admitted its necessity, C. J. Gibson, of the Supreme Court of Pennsylvania was desirous of throwing off the authority of Waugh *vs.* Carver as having been made subsequently to the American Revolution, but was unable to take the responsibility. Miller *vs.* Bartlet, 15 S. & R., 157 ; Hazard *vs.* Hazard, 1 Story, 371 ; Story's Part., § 35 *et passim.*

Except in a few instances, as in the Supreme Court of New Hampshire, (see Bromley *vs.* Elliot, 38 N. H., 287) the doctrine referred to was regarded as law, until recently, when its authority has been successfully attacked and overthrown. "A series of cases has decided that the law of partnership is a branch of the law of agency ; that the test to determine the liability of one sought to be charged as a partner, is whether the trade is carried on in.his behalf ; and that participation in the profits is not decisive of that question, except so far as it is evidence of the relation of principal and agent between the person taking the profits and those actually carrying on the business." Gray's Notes on Story's Part., § 49. The decisions last referred to are Cox *vs.* Hickman, 8, House of

G. E. Tucker and G. Waller *v.* Estate of T. Metcalf, deceased.

Lord's cases, 268 ; Kilshaw *vs.* Jukes, 3 B. & S., 847 ; Bullen *vs.* Sharp, Law Reports, 1 C. P., 86.

The reasoning of the Court in the recent English cases has special significance. In Bullen *vs.* Sharp, Mr. Justice Blackburne referring to the rule in Waugh *vs.* Carver, says: "This decision had never been overruled—when more recently it was a common opinion, (in which I for one participated) that the doctrine had become so inveterately part of the law of England, that it would require legislation to reverse it. In Cox *vs.* Hickman, the creditors of a trade had agreed that their debtor's trade should be carried on for the purpose of paying them their debts out of the profits; and the composition deed, to which they were parties, secured to them a property in the profits. The rule laid down in Waugh *vs.* Carver, if logically carried out, led to the conclusion that all the creditors who assented to this deed, and by so doing agreed to take the profits, were individually liable as partners; but when it was sought to apply the rule to such an extreme case, it was questioned whether the rule itself was really established. In the result, the House of Lords, consisting of Lord Campbell, C., and Lords Brougham, Cranworth, Wensleydale and Chelmsford—unanimously decided that the creditors were not partners. Lord Cranworth says : 'It was argued that, as they would be interested in the profits, therefore they would be partners. But this is a fallacy. This no doubt is, in general, a sufficiently accurate test.' I think that the *ratio decidendi* is, that the proposition laid down in Waugh *vs.* Carver, viz., that a participation in the profits of a business does of itself, by operation of law, constitute a partnership, is not a correct statement of the law of England ; the test being in the language of Lord Wensleydale, whether it is such a participation of profits as to constitute the relation of *principal and agent* between the person taking the profits and those actually carrying on the business." 1 Law Rep. (1865), 107.

In Holmes *vs.* Old Colony R. R. Corp., 5 Gray, 59, a firm had leased a hotel of the Corporation for $500 and "one half net proceeds," but it was held that no partnership existed, the Court, Dewey, J., saying that it is no longer true that receiving profits, or net profits, must produce that result, but that all the circumstances must be considered.

In the following cases it was held that there was no partnership: Case of a ferry which A leased to B, the latter to pay expenses, and have one half the gross earnings. Heimstreet *vs.* Howland, 5 Denio, 68. Agreement that A furnish B with wool to make into satinets for A, for forty per cent. on sales. Turner *vs.* Bissell, 14 Peck, 192; and see Dennis *vs.* Cabot, 6 Met., 82; Bradley *vs.* White, 10 Met., 303; Pratt *vs.* Langdon, 12 Allen, 544; Hitchings *vs.* Ellis, 12 Gray, 449. Agreement that A furnish B with books to sell for a share in the profits. Newman *vs.* Bean, 1 Fost., 95. Agreement that a ship-owner victual and man the ship and pay half port charges, the master paying the other half, and rigging the ship, the profits on freights to be equally divided. Cutler *vs.* Winsor, 6 Pick., 337; Reynolds *vs.* Toppan, 15 Mass., 370. But see Julio *vs.* Ingall, 1 Allen, 41. In Hazard *vs.* Hazard, 1 Story, 372, it was agreed that B. H. "devote his whole time, excepting his attendance on religious meetings, exclusively to the management of the factories of T. R. H., taking the machinery as it is, and returning it in like order," for one fourth of the profits. See Champion *vs.* Bostwick, 18 Wend., 175; Burckle *vs.* Eckhart, 3 Coms., 132; Conklin *vs.* Barton, 43 Bar., 438; Gratz *vs.* Bayard, 11 S. & R., 41.

Examination of the authorities cited, and of the cases referred to by them, will show that a partnership can not be inferred merely from a "common interest," from a sharing in profits, from the right to account, nor from a direct control over the business. How, in fact, can an agent prove a disputed claim for agreed profits, unless he can have an account?

G. E. Tucker and G. Waller *v.* Estate of T. Metcalf, deceased.

(Gray's Notes on Story's Part., p. 89.)   All these relations between parties are not inconsistent with those of principal and agent, and are, therefore, insufficient of themselves to establish a partnership *a priori*, but in order to decide the matter, we must look to the agreed intention of the parties, as shown by their words and acts, prior to any dispute arising. The legal consequences of a partnership exist without agreement, and often contrary to the expectation of parties, but it is illogical to assume the consequences and thence infer the cause.

Did the parties in this case intend to act together *as principals* in a common business ?   We think such was their intention.   It was agreed that the plantation should pay for losses by injury to animals : this means that the partnership pays for them.   The plantation, with all its improvements, as agreed, "shall revert to said T. Metcalf or his heir." This indicates that during the term of the partnership, the *use* of the land is in the partners alone.   We also have the incidents of a community of interest, a division of profits, a control of the plantation by Tucker & Waller, and of mutual and common accounts, which tend to confirm the conclusion that a partnership was meant.

What are the incidents of this partnership, and what are the mutual rights, duties and obligations of the partners ? First, the partnership itself was dissolved at Metcalf's death. The agreement for the term of ten years was not binding upon the heirs and creditors of Metcalf, because there was no stipulation to that effect, and such express stipulation is always necessary, in articles of co-partnership for a term of years, in order to prevent a dissolution at the death of either partner.   Sometimes a direction in the will of the deceased partner is regarded as an expression of his assent to such an agreement, leaving it optional with the surviving partners to continue the business with the representatives or devisees of the testator ; but in this case, the directions in Metcalf's will

can have no such intent, in view of his previous declarations, appearing in his letters, which are in evidence, that he never regarded the complainants as partners.

The Roman law prohibited the continuance of a partnership, even by previous agreement, after the death of any partner. The English law never went to that length, but has always allowed the continuance of the partnership, but only by express stipulation. Burwell *vs.* Mandeville's Ex. 2 H., 573; Scholefield *vs.* Eichburger, 7 P., 594; Story's Part., §§ 84, 85, 196. The accounts of the partnership must be made up to the time of its dissolution, allowing time to wind up the concern. This view affects the mutual rights and duties of the executors and complainants, inasmuch as they are to be regarded, not as partners, but as trustees for each other. Story's Part., § 130.

The terms of the partnership are clear: The complainants are "to take charge and carry on," Metcalf to furnish land, with the improvements and animals then upon the land, and all capital or means required "for the sufficient conduct of the plantation," the partnership paying for losses by injury to animals, the cost of their keeping, and interest on the money furnished; the plantation and improvements to revert to Metcalf, or his heirs, at the expiration of the partnership.

To open a partnership account after the death of one of the partners, requires a clear case of fraud or gross error, and allowances are not usually made for any contribution to the common stock. Foster *vs.* Hodgson, 19 Ves., 180.; Dexter *vs.* Arnold, 3 Mason, 284; Winsor *vs.* Savage, 9 Metcalf, 347; Story's Part., § 193, note 3, § 233, note 4, and § 349.

In regard to the claim of $1,089, claimed by the complainants for their implements, for the payment of which by note they show Metcalf's receipt, it appears that Metcalf agreed to furnish the implements then on the place, and that the complainants not having agreed so to do, furnished those mentioned in Schedule C. The complainants can recover at

G. E. Tucker and G. Waller *v.* Estate of T. Metcalf, deceased.

law any implements belonging to them which they can identify, but if they have volunteered the use of them, without any agreement that they should be paid for their use, they can not, at this late day, have the accounts opened, and a claim allowed which the they failed to make seasonably, during Metcalf's life.

There is no evidence that Metcalf charged for the animals on the place which he agreed to furnish. There is no evidence that the complainants furnished money to carry on the plantation, or that Metcalf failed to furnish capital as agreed. It was not intended that the complainants should share in the gross profits, but only in the net profits. If the profits were wholly or in part devoted to carrying on and enlarging the business, it was done by mutual assent, and if no gain resulted therefrom, no one can be blamed, unless for violation of good faith, or by failure to exercise the diligence and prudence that a reasonable man could require. The complainants made no objections, called for no division of profits, but continued in the business as it was carried on, partly with money furnished by Metcalf, and partly with the proceeds of sugar, in the net profits of which they were interested. If the result was unsatisfactory, it is too late to claim reimbursement for their ventures, and too late to compel, on the part of their deceased partner, a specific performance of any part of the agreement, which, in good faith, and exercising reasonable care, he failed to perform.

By the law of Partnership, neither party is entitled to payment for personal services, unless by express agreement. This disposes of the mutual claim for services in this case. The partners are presumed to have worked for their own as well as the common interest, and not at the expense of the firm. Franklin *vs.* Robinson, 1 Johns., C. 158 ; Story's Part., § 182 ; Caldwell *vs.* Lieber, 7 Paige, 483 ; Cradford *vs.* Kimberly, 3 Johns., C. 431.

No allowance can be made for the "Hema" lot, bought by

Metcalf at his own instance, nor for his payments of Wyllie's note of $2,000, or Bates's counsel fees of $227.25, and insurance premiums. The parties had not so agreed. See Shattuck *vs.* Lawson, 10 Gray, 407.

For Metcalf's failure to furnish machinery requisite to take off the crop of 1864, and for their loss consequent thereon, no allowance can be made the complainants. Upon the evidence, we are of the opinion that Metcalf did all he was able to do to furnish, seasonably, the required machinery. He had everything to gain by so doing, and the evidence fails to show an approach to culpable negligence on his part. Story's Part, § 173, and note; Coll, do., § 178; Lyles *vs.* Styles, 2 Wash. C. C. 224.

It is, however, a clear principle of law, that partnership property shall be devoted to partnership purposes. The partnership must be allowed for all sums paid for Metcalf's private debts, or for the use of his family, from proceeds of sugar. No deficiencies in the executor's accounts are shown, and in the argument, the charges concerning the wood, shooks, &c., also concerning unreasonable delay to account, are withdrawn. The sums admitted as paid on private account are, $11,795, $2,116.66, $3,250, and $2,821. These are to be allowed the fund, and can not be regarded as chargeable to the plantation. Story's Part, § 326.

If debts incurred by Metcalf for the purpose of furnishing means, as agreed, to carry on the plantation, were paid out of the proceeds of sugar, the sums so paid are to be allowed to the firm, but no allowance is to be made for payments of interest. The evidence fails to satisfy us that interest was paid against the complainants' protest, or that higher rates were paid than were required to raise funds.

The partners agreed that all "improvements" should revert to the plantation; without this clause, all improvements and all articles paid for by Metcalf's money, or by money which he obtained, would have belonged to his

estate. But it seems that the firm invested to some extent the proceeds of the sugar. The question arises, whether the improvements paid for by the undivided profits are to be regarded as firm property, or as reverting, under the original agreement; and if they revert, as to the meaning of the term improvements. We are of the opinion that the partners enlarged the business by investing proceeds of sugar sales, in addition to the means furnished by Metcalf, under the original agreement concerning the reverting of improvements.

The term improvements, according to Bouvier, applies principally to buildings, "though generally it extends to amelioration of every description of property, whether real or personal."

The old rule concerning fixtures and standing crops, is greatly enlarged in favor of tenants, for the encouragement of trade and agriculture. Miller *vs.* Plumb, 6 Cow., 665. In Lawton *vs.* Lawton, 3 Atk., 13, a fire-engine, erected by a tenant for a colliery, was held not to be a fixture. So with machinery erected for manufacturing purposes, on timbers imbedded in the soil, or fastened thereto with bolts. House *vs.* House, 10 Paige, 158. Also, looms in a woolen mill. Murdock *vs.* Gifford, 18 N. Y., 28. And machinery in a cotton mill, removable without any injury to itself or the building. Vanderpoel *vs.* Van Allen, 10 Bar. 161. But such a rule would not hold between vender and purchaser, or mortgager and mortgagee. Winslow *vs.* Merchants Ins. Co., 4 Met., 306.

In the present case, the proper rule is that which prevails between landlord and tenant, as to improvements purchased by common funds, and as to the crop remaining at the date of the winding up of the partnership, which was not until the expiration of the original ten years from December 14th, 1857.

We are of the opinion that all stock, tools, and engines

removable without injury to the buildings, and bought with partnership funds, and the crop standing December 14th, 1867, are to be regarded as firm property.

As for the sums paid for labor contracts, if paid from money derived from the business, they must be regarded as paid by common consent, and as deemed necessary to obtain the labor. An apportionment of sums so paid, between the firm and the estate, could only be made under an agreement to that effect. In Metcalf's letter to Waller, of July 29th, 1865, after writing that he has fifty coolies from the *Matador*, at $150 each for their contracts, "which A., W. & Co. will send you," he adds: "As their contracts may have to be transferred at the end of *your term*, it will be best to keep them in good condition, in order to realize as much as possible on them. Not so good a lot, that came in the same day per *Golden West*, realized $150 each for their contracts for five years, at $5 per month." We think this shows the intention of the partners, that for the term of labor remaining to the estate, an allowance should be made the firm, deducting, of course, loss by death or disease, and such allowance may be made in regard to the coolies; but no such agreement about the native laborers was made.

The statutes do not require—and it does not appear—that the Court ordered any appraisement by the executors. As for the mortgage and notes given by the executor, to cover liabilities incurred by Metcalf,—whatever may have been the legal right of the executor to give them, as against heirs and creditors,—it does not appear that the firm were injured thereby, as their profits were not devoted to paying the principal, and for the interest thereon, the firm was liable. No allowance can be made for any supposed profit that might have accrued from a different course, as there seems to have been no bad faith shown in the course pursued.

It will be remembered that, although the complainants have a good claim against the estate for sums paid from pro-

ceeds of the business for Metcalf's private account, yet the firm were liable for sums advanced for the plantation.

An order of reference to a master may be taken out, directing an appraisement of the net value of the crop standing December 14th, 1867, and of the implements and machinery as already stated, and of all sums allowed to the fund, and of the respective shares therein of the complainants, of one-fifth each; and upon the coming in of the master's report, decree will be made, accordingly, in favor of the complainants.

R. H. Stanley and S. H. Phillips for complainants.

C. C. Harris, J. Montgomery, H. Thompson and A. F. Judd for respondents.

Honolulu, January 19th, 1870.